FILED IN OPEN COURT
U.S.D.C ATLANTA

JUL 2 3 2014

JAMES N. HATTEN, CLERK
By: _____ Deputy Clerk

ORIGINAL

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF GEORGIA
ATLANTA DIVISION

| | |
|---|---|
| UNITED STATES OF AMERICA<br><br>v.<br><br>TRACEY COTA | Criminal Information<br><br>No. 1:14-CR-275 |

THE UNITED STATES ATTORNEY CHARGES THAT:

## COUNT ONE
### Conspiracy to Pay and Receive Remuneration in Exchange for Medicaid Patient Referrals
### (18 U.S.C. § 371)

### BACKGROUND

At all times relevant to this Bill of Information, unless otherwise stated:

### The Medicaid Program

1.  Medicaid is a cooperative federal-state public assistance program established by Title XIX of the Social Security Act, 42 U.S.C. §§ 1396-1396v, under which federal matching funds are available to states that elect to pay for all or part of specified health care services furnished to eligible low-income persons, among others. For each year from 2000 to 2012, the United States Department of Health and Human Services ("HHS"), through its agency, the Centers for Medicare and Medicaid Services ("CMS"), provided approximately 60% of the funding for the Georgia Medicaid program and 70% of the funding for the South Carolina Medicaid program.

2. Medicaid is a "health care benefit program," as defined by Title 18, United States Code, Section 24(b). Medicaid is also a "Federal health care program," as defined in Title 42, United States Code, Section 1320a-7b(f). Individuals who receive any type of benefit under Medicaid are referred to as Medicaid "beneficiaries."

3. The Georgia and South Carolina Medicaid programs cover the costs associated with emergency labor and delivery services provided by a hospital to pregnant women who meet the state's respective Medicaid financial eligibility requirements, but who are ineligible for Medicaid due to their status as an illegal alien ("Emergency Medical Assistance" or "EMA"), 42 U.S.C. § 1396b(v)(2)-(3).

4. The Georgia and South Carolina Medicaid programs also cover certain costs associated with medical services provided by a hospital to a child born to a mother eligible for and receiving EMA ("Newborn Medicaid"). This includes services provided by a hospital to a newborn during a stay in a neonatal intensive care unit.

5. Hospitals that provide services to Georgia or South Carolina Medicaid beneficiaries are able to apply for and obtain a Georgia or South Carolina Medicaid "provider number." Hospitals that are issued a Georgia or South Carolina Medicaid provider number are able to file claims with Georgia or South Carolina Medicaid to obtain reimbursement for services provided to Medicaid beneficiaries.

6. In both Georgia and South Carolina, provider hospitals are required to enter into contracts with the state referred to as "provider agreements." These

provider agreements, among other things, prohibit provider hospitals from paying remuneration for referrals of Medicaid patients and further prohibit provider hospitals from billing Medicaid for services rendered to these patients.

7. The federal Anti-Kickback Statute ("AKS") prohibits any person from knowingly and willfully offering or paying any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment can be made in whole or part by a Federal health care program. 42 U.S.C. § 1320a-7b(b)(2).

8. The AKS likewise prohibits any person from knowingly and willfully soliciting or receiving any remuneration, directly or indirectly, overtly or covertly, in cash or in kind, in return for referring an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment can be made in whole or part by a Federal health care program. 42 U.S.C. § 1320a-7b(b)(1).

9. In Georgia, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to Medicaid beneficiaries to the Georgia Department of Community Health for payment.

10. In South Carolina, provider hospitals participating in the Medicaid program submit claims for hospital services rendered to Medicaid beneficiaries to the South Carolina Department of Health and Human Services for payment.

11. The Georgia and South Carolina Medicaid Programs would not pay claims submitted by a provider hospital for services that it knew were the result

of a provider hospital's payments to any person for the referral of Medicaid beneficiaries.

### Relevant Entities and Defendant

12. Hispanic Medical Management, Inc. d/b/a Clinica de la Mama and its affiliate, Clinica de la Mama, Inc. d/b/a Clinica de la Mama (collectively referred to as "Clinica"), were Georgia corporations headquartered in the Northern District of Georgia. From at least 1999 to in or around September 2010, Clinica operated medical clinics that provided prenatal care to predominantly undocumented Hispanic women in Norcross, Austell, Cumming, Forest Park, Roswell, Lovejoy, Lawrenceville, Windy Hill (Smyrna), and Plaza Fiesta (Chamblee), Georgia, and in Hilton Head, South Carolina, at various times. In September 2010, Clinica's executives split up and divided the clinics between themselves and their respective new companies, CDB and Company A, described below.

13. International Clinical Management Services, Inc. d/b/a Clinica del Bebe ("CDB") was a Georgia corporation headquartered in Norcross, Georgia. In or around September 2010, CDB took over the operations of the Clinica clinics located in Norcross, Windy Hill (Smyrna), and Forest Park.

14. Company A was a Georgia corporation headquartered in the Northern District of Georgia. In or around September 2010, Company A took over the operations of the Clinica clinics located in Chamblee (Plaza Fiesta), Roswell, and Hilton Head.

15. Defendant TRACEY COTA was the Chief Operating Officer of Clinica from at least 2000 until in or around September 2010, and was the Chief Executive Officer of CDB from in or around September 2010 to in or around July 2012.

16. Company B was a publicly-held Texas-based corporation that owned and operated hospitals across the United States. Company B's subsidiaries, Hospital B-1, Hospital B-2, and Hospital B-3, were located in, and did business in, the Northern District of Georgia, and Hospital B-4 was located in, and did business in, South Carolina.

17. Hospital B-1 was located in Atlanta, Georgia. From at least March 2000 to at least in or around July 2012, Hospital B-1 was enrolled as a provider in the Georgia Medicaid program and billed the Georgia Medicaid program for EMA and Newborn Medicaid services, at various times.

18. Hospital B-2 was located in Roswell, Georgia. From at least November 2001 to at least July 2012, Hospital B-2 was enrolled as a provider in the Georgia Medicaid program and billed the Georgia Medicaid program for EMA and Newborn Medicaid services, at various times.

19. Hospital B-3 was located in Griffin, Georgia. From at least March 2004 to at least September 2004, Hospital B-3 was enrolled as a provider in the Georgia Medicaid program and billed the Georgia Medicaid program for EMA and Newborn Medicaid services, at various times.

20. Hospital B-4 was located on Hilton Head Island, South Carolina. From at least November 2006 to at least January 2011, Hospital B-4 was enrolled as a

provider in the South Carolina Medicaid program and billed the South Carolina Medicaid program for EMA and Newborn Medicaid services, at various times.

21. Company C was a publicly-held Florida-based corporation that owned and operated hospitals across the United States. Company C's subsidiary, Hospital C-1, was located in Monroe, Georgia. From at least March 2008 to at least November 2009, Hospital C-1 was enrolled as a provider in the Georgia Medicaid program and billed the Georgia Medicaid program for EMA and Newborn Medicaid services, at various times.

## Overview of the Conspiracy

22. As described further below, TRACEY COTA, executives from Hospitals B-1, B-2, B-3, B-4, and C-1 (collectively, the Hospitals), and others agreed that Clinica would be compensated for referring its patients to the Hospitals for delivery. To accomplish this goal, Hospitals B-1, B-2, B-3, B-4, and C-1 contracted with, and paid, Clinica to provide services to the Hospitals, but the true purpose of the relationship was to pay for Medicaid patient referrals.

23. TRACEY COTA and others operated several Clinica clinics located in the Northern District of Georgia and on Hilton Head Island, South Carolina that provided prenatal care predominantly to undocumented Hispanic women who did not have health insurance. Depending how far along a woman was in her pregnancy, Clinica charged between $1,200 to $1,700 cash for prenatal care, which covered office visits with medical professionals, certain laboratory testing, and one ultrasound.

24. Certain executives of Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, Hospital C-1, and other executives affiliated with Company B and C understood that Clinica was very successful at attracting pregnant, undocumented Hispanic women to its clinics for prenatal care, that Clinica could control where these women delivered their babies, and that if these women delivered at their respective hospitals, the hospitals could potentially realize a significant revenue stream from Georgia Medicaid or South Carolina Medicaid for providing labor and delivery services to these women (EMA) and providing services to their newborn babies (Newborn Medicaid).

25. Certain executives of Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1 and others arranged for remuneration to be paid to Clinica in exchange for TRACEY COTA and others referring Clinica patients to Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1.

26. Specifically, TRACEY COTA, certain executives of Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1, and others created and caused to be created contracts between the hospitals and Clinica under which these hospitals agreed to pay Clinica to provide various services to the hospitals, including the management of an OB/GYN residency clinic, translation services, translation management services, marketing consulting services, Medicaid eligibility determination paperwork, educational services, birth certificate services, and community outreach services.

27. In reality, however, certain executives of Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1, and others caused the payment of

millions of dollars to Clinica under these contracts in exchange for Clinica referring patients to Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1.

28. As a result of this arrangement, the Hospitals were then able to bill Georgia and South Carolina Medicaid for hundreds of millions of dollars for labor and delivery services provided at the Hospitals to patients coming from Clinica and for services provided to their newborns.

## CONSPIRACY TO PAY AND RECEIVE REMUNERATION IN EXCHANGE FOR MEDICAID PATIENT REFERRALS

29. From in or around July 2000 to in or around July 2012, in the Northern District of Georgia and elsewhere, TRACEY COTA did willfully, that is, with the intent to further the objects of the conspiracy, and knowingly combine, conspire, confederate, agree and have a tacit understanding with certain executives of Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1, and others known and unknown to the United States Attorney, to commit certain offenses against the United States, namely:

a. To violate Title 42, United States Code, Section 1320a-7b(b)(2), by knowingly and willfully offering and paying remuneration, directly and indirectly, overtly and covertly, in cash and in kind to any person to induce such person to refer an individual to a person for the furnishing or arranging for the furnishing of any item or service for which payment may be made in whole and in part by a Federal health care program, that is, the Georgia and South Carolina Medicaid programs; and

b. To violate Title 42, United States Code, Section 1320a-7b(b)(1) by knowingly and willfully soliciting and receiving remuneration, directly and indirectly, overtly and covertly, in cash and in kind, in return for referring an individual to a person for the furnishing and arranging for the furnishing of any item and service for which payment may be made in whole and in part by a Federal health care program, that is, the Georgia and South Carolina Medicaid programs.

## Purpose of the Conspiracy

30. The purpose of the conspiracy was for TRACEY COTA and her co-conspirators to unlawfully enrich themselves and Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1 by paying and receiving illegal remuneration in exchange for referrals of Medicaid patients so that these hospitals could bill and obtain money from the Georgia and South Carolina Medicaid programs for services provided to the unlawfully referred Medicaid patients and their newborns.

## Manner and Means of the Conspiracy

The manner and means by which the defendant and her co-conspirators sought to accomplish the objects and purpose of the conspiracy included, among other things:

31. Certain OBs and their mid-levels provided free prenatal care to Clinica patients with the understanding and expectation that TRACEY COTA and others at Clinica would ensure that these patients delivered at the hospital where the OB had privileges, including Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-

4, and Hospital C-1, so that the OB or his/her call group could deliver the baby and so that his/her practice could bill and receive payment from Medicaid.

32. Certain executives of Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1 and others arranged for remuneration to be paid to Clinica in exchange for TRACEY COTA and others referring Clinica patients to Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1. Specifically, TRACEY COTA, certain executives of Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1, and others created and caused to be created contracts between the hospitals and Clinica under which these hospitals agreed to pay Clinica to provide various services to the hospitals, including the management of an OB/GYN residency clinic, translation services, translation management services, marketing consulting services, Medicaid eligibility determination paperwork, educational services, birth certificate services, and community outreach services.

33. Despite language in these contracts stating that the "[a]greement contains the entire understanding of the parties with respect to the subject matter hereof" and, in several contracts, that "[t]he parties acknowledge that none of the benefits granted [Clinica] are conditioned on any requirement that [Clinica] or any [Clinica staff] make referrals to, be in a position to make or influence referrals to, or otherwise generate business for [the hospital] or its affiliates," and that "the parties certify that they shall not violate the Anti-Kickback statute," the understanding between TRACEY COTA, certain executives of Hospital B-1, Hospital B-2, Hospital B-3, Hospital B-4, and Hospital C-1, and others was that

the Hospitals' contracts with and payments to Clinica under these contracts were conditioned on and in exchange for Clinica referring pregnant, undocumented Hispanic women to their hospitals. In fact, the Hospitals did not have a need for most of the services outlined in these contracts unless Clinica referred its patients to the hospitals.

34. To ensure that Clinica patients delivered at only Company B and Company C hospitals, TRACEY COTA and others allowed only OBs who had delivery privileges at Company B hospitals, including Hospital B-1, Hospital B-2, Hospital B-3, and Hospital B-4, and Company C's hospital, Hospital C-1, to see patients at the Clinica clinics.

35. Clinica staff assigned these OBs certain day and time slots to see patients at the Clinica clinics. At or near a Clinica patient's first prenatal appointment, she was asked to provide a preferred day of the week and time for her periodic appointments which determined who her OB would be and where she would deliver her baby depending on at which Company B or Company C hospital her assigned OB had privileges.

36. The majority of Clinica patients were seen by the OB's midwife or nurse practitioner and often times did not meet their OB until the final weeks of their pregnancy, if at all, before the delivery.

37. Each Clinica patient was provided with an identification card at or near her first appointment that identified her assigned OB and hospital. The majority of the patients did not question whether they had the option of delivering at a different hospital. If a patient did ask the Clinica staff if they could deliver their

baby at a different, perhaps more convenient, hospital, the Clinica staff was instructed to discourage them from doing so, to emphasize the high likelihood of success of getting Medicaid to pay for the costs of their labor and delivery at Company B and Company C hospitals, and to suggest that they might not be successful at getting Medicaid to pay if they delivered at another hospital.

38. Clinica staff assisted the patients with filling out the requisite paperwork in order to qualify them for EMA and forwarded the paperwork to their assigned Company B or Company C hospital.

39. Following delivery, Clinica staff followed through to ensure that the Medicaid eligibility paperwork for both the mother and the baby was complete so that the Company B or Company C hospital could successfully bill and be paid by Georgia or South Carolina Medicaid for the costs of providing labor and delivery services to the mother under EMA and services provided to the newborn child under Newborn Medicaid.

## Overt Acts

In furtherance of the conspiracy, and to accomplish its object and purpose, the conspirators committed and caused to be committed, in the Northern District of Georgia and elsewhere, including but not limited to the following overt acts:

40. In or around Fall 2000, TRACEY COTA met with an executive of Hospital B-2 and others and discussed Clinica referring patients to Hospital B-2 in exchange for Hospital B-2 contracting with and paying Clinica to provide services to Hospital B-2.

12

41.     On or about October 30, 2001, TRACEY COTA, an executive of Hospital B-2, and another signed a contract between Clinica and Hospital B-2 under which Hospital B-2 agreed to pay Clinica to provide services, including translation and Medicaid eligibility determination (hereafter "MEP") services, to Hospital B-2.

42.     On or about August 13, 2002, TRACEY COTA, an executive of Hospital B-1, and another person signed an amendment to Hospital B-1's contract with Clinica under which Hospital B-1 agreed to pay Clinica to provide translation services at Hospital B-1.

43.     On or about the week of December 23-30, 2003, TRACEY COTA and an executive of Hospital B-2 signed a contract between Clinica and Hospital B-2 under which Hospital B-2 agreed to pay Clinica to continue to provide services, including translation and MEP services, to Hospital B-2.

44.     In or around January 2004, TRACEY COTA met with an executive of Hospital B-3 and others and discussed Clinica referring patients to Hospital B-3 in exchange for Hospital B-3 contracting with and paying Clinica to provide services to Hospital B-3.

45.     On or about March 2, 2004, TRACEY COTA and an executive of Hospital B-3 signed a contract between Clinica and Hospital B-3 under which Hospital B-3 agreed to pay Clinica to provide services, including translation and MEP services, to Hospital B-3.

46.     On or about December 19, 2005, TRACEY COTA and an executive of Hospital B-1 signed a contract between Clinica and Hospital B-1 under which

Hospital B-1 agreed to pay Clinica to provide services, including translation and MEP services, to Hospital B-1.

47. In or around Spring 2006, TRACEY COTA and an executive of Hospital B-4 discussed Clinica referring patients to Hospital B-4 in exchange for Hospital B-4 contracting with and paying Clinica to provide services to Hospital B-4.

48. On or about November 7, 2006, TRACEY COTA and an executive of Hospital B-4 signed a contract between Clinica and Hospital B-4 under which Hospital B-4 agreed to pay Clinica to provide services, including translation and MEP services, to Hospital B-4.

49. On or about February 1, 2007 and March 6, 2007, TRACEY COTA and an executive of Hospital B-1 signed an amendment to Hospital B-1's contract with Clinica, adding a term entitled "Compliance Obligations."

50. In or around January 2008, TRACEY COTA and an executive of Hospital C-1 discussed Clinica referring patients to Hospital C-1 in exchange for Hospital C-1 contracting with and paying Clinica to provide services to Hospital C-1.

51. On or about March 25, 2008, TRACEY COTA and an executive of Hospital C-1 signed a contract between Clinica and Hospital C-1 under which Hospital C-1 agreed to pay Clinica to provide services, including translation and MEP services, to Hospital C-1.

52. On or about July 29, 2008 and on or about September 7, 2008, TRACEY COTA and an executive of Hospital B-1 signed a contract between Clinica and

Hospital B-1 under which Hospital B-1 agreed to continue to pay Clinica to provide services, including translation and MEP services, to Hospital B-1.

53.     On or about August 6, 2009, TRACEY COTA prepared a letter addressed to an executive of Hospital C-1 regarding Clinica's final invoice to Hospital C-1 and Clinica's decision to close its Lawrenceville clinic. That same day, TRACEY COTA prepared Clinica invoice #10025 for Hospital C-1 requesting $4,178.13 in payment.

54.     On or about September 1, 2009, TRACY COTA deposited into a Clinica bank account a check in the amount of $4,178.13 received from Hospital C-1 for payment of Clinica invoice #10025.

55.     On or about September 30, 2009, TRACEY COTA prepared and submitted or caused to be submitted Clinica invoice # 10019 to Hospital B-1 requesting $41,879.41 in payment.

56.     On or about October 14, 2009, TRACEY COTA deposited into a Clinica bank account a check numbered 008557221 in the amount of $41,879.41 written from a Company B bank account for payment of Clinica invoice #10019 submitted to Hospital B-1.

57.     On or about August 2, 2010, TRACEY COTA prepared and submitted or caused to be submitted Clinica invoice # 10029 to Hospital B-1 requesting $41,879.41 in payment.

58.     On or about August 31, 2010, TRACEY COTA deposited into a Clinica bank account a check numbered 008839103 in the amount of $41,879.41 written

from a Company B bank account for payment of Clinica Invoice #10029 submitted to Hospital B-1.

59.  On or about May 21, 2011, TRACEY COTA and an executive of Hospital B-1 signed a contract between CDB and Hospital B-1 under which Hospital B-1 agreed to pay CDB to provide translation and MEP services to Hospital B-1.

All in violation of Title 18, United States Code, Section 371.

SALLY QUILLIAN YATES
UNITED STATES ATTORNEY

JEFFREY H. KNOX
CHIEF, FRAUD SECTION
CRIMINAL DIVISION
U.S. DEPARTMENT OF JUSTICE

*Sally B. Molloy*
SALLY B. MOLLOY
ASSISTANT U.S. ATTORNEY
Georgia Bar No. 140816

*O. Benton Curtis, III* by SBM
O. BENTON CURTIS III
ASSISTANT CHIEF

*Robert A. Zink* by SBM
ROBERT A. ZINK
ASSISTANT CHIEF

600 U.S. Courthouse
75 Spring St., SW
Atlanta, GA 30303
404-581-6000; Fax 404-581-6181